OPINION OF THE COURT
Marybeth S. Richeoath, J.
On June 9, 2004, the Administration for Children’s Services (ACS) filed a petition in the above-captioned matter alleging that the subject child, then four-year-old T.J., had sustained a second degree burn on her elbow, a bruise above her eye, a laceration to her lip, a bite mark to her foot, and numerous scars and scratch marks over her body; that she had been in the care of respondents who are her biological parents; and that they had no reasonable explanation for how she had sustained these injuries. T.J. had been returned home on a trial discharge to her parents in April 2004,[1] after spending almost three years in foster care following findings of abuse entered against the parents after fact-finding and dispositional hearings, which concluded on March 11, 2003 with the entry of orders placing the children in foster care and requiring that the parents cooperate with services designed to reunify the family.
The original petition, filed on February 21, 2001 under docket No. NA02731-3/01,[2] charged that on February 20, 2001 T.J., then 10 months old, had been hospitalized with a burn mark to her right eye, burn marks below her right cheek, a one-inch burn mark across the back of her neck, bruises and burn marks below her nose, three fractured ribs, cuts and scab marks on her hands and arms, cuts behind and inside her ears, cuts and scabs on both the soles of her feet, a circular mark on the top of *633 her head, bruises to the left side of her face and swollen hands. Respondents failed to provide a reasonable explanation for the child’s injuries. The petition also noted that, in November 2000, when she was only six months old, T.J. had sustained a dislocated and fractured elbow, and respondents failed to seek medical attention for her until two days after the injury had been sustained. T.J. was adjudicated abused under Family Court Act § 1012 (e) (i) after fact-finding which concluded April 30, 2002. Her three siblings, J.W., J.N. and A.J., were adjudicated derivatively abused as a result of the same fact-finding.
Respondents cooperated with services to reunify the family. J.W. returned home in November 2003. The other children returned thereafter, with T.J. and A.J. returning in April 2004. Evidence at Fact-Finding on the Instant Case
The fact-finding commenced on October 22, 2004 with the testimony of Nadia Eunice (a physician’s assistant who treated T.J.) and Paula Smith (the foster care agency worker), and continued on June 16, 2005 with the testimony of Renee Clement (the ACS caseworker). At that point, ACS wished to call the doctor who treated T.J. at New York Hospital, but he was not available for the previously scheduled trial dates. The case was adjourned until February 14, 2006 for the doctor’s testimony, but, unfortunately, the court was out ill. Though February 16, 2006 had also been set aside as trial time, the doctor was not available and the case was adjourned to July 24, 2006 for the doctor’s testimony.[3] Unfortunately, on July 24, 2006, the doctor was subpoenaed to the grand jury in Kings County on a case with an incarcerated defendant who was eligible for relief under CPL 180.80, which took priority over the instant matter. Although trial time had been scheduled for September 7, 2006, the doctor again was not available, and the court adjourned the case to December 19, 2006. On that date, Dr. Philip Hyden testified; his testimony was continued on the next date, February 27, 2007. With the conclusion of the doctor’s testimony, the agency rested. Respondent mother’s testimony began on the same date, and continued on July 6 and July 23, 2007. After her testimony, respondent mother rested. The Law Guardians rested without offering independent evidence.
*634 The Presentment Agency’s Case
Nadia Eunice, a physician’s assistant at the Alpha K clinic, testified that, on June 4, 2004, respondent mother brought T.J. for treatment of a burn to her right arm. Ms. Eunice testified that she observed two two-centimeter second degree burns to the “medial elbow area.” The burn was irregular in shape and the superficial skin was not intact. Ms. Eunice testified that respondent mother told her that T.J. had sustained the burn two days prior when she accidentally touched an electrical outlet with her hand after taking a shower. Respondent mother told the physician’s assistant that T.J. had been in foster care prior to this injury due to child abuse, and had recently been returned. Ms. Eunice testified that T.J. was very scared and very quiet during the exam. Ms. Eunice tried to engage her in conversation, but T.J. did not respond. Ms. Eunice also observed a healing scar above the child’s left eye, and that the child appeared malnourished, in that she was very small and appeared younger than her stated age. Ms. Eunice reported the case to the State Central Register (SCR) because the explanation given by respondent mother was inconsistent with the injury; touching her hand to an electrical outlet after coming out of the shower would not have caused a burn to T.J.’s elbow. Ms. Eunice was also concerned that respondent mother had waited two days before seeking medical care for T.J.
Paula Smith, the agency caseworker, testified that T.J. was trial discharged to respondents in May 2004. Ms. Smith first learned of T.J.’s injuries when respondent father called her on June 6, 2004, from a pay phone, to report it. Respondent father told Ms. Smith that the Thursday prior to his phone call,[4] respondent mother had been doing respondent father’s hair, and asked the father to give her the blow-dryer. T.J. ran to get the blow-dryer for her mother, but the mother grabbed T.J. by the arm to prevent her from getting the blow-dryer. Respondent father explained that T.J.’s hands were wet and the mother did not want her to touch the blow-dryer. Respondent mother wrapped T.J.’s arm up and the next day they noticed the skin coming off T.J.’s elbow. At that point, according to respondent father, Toni N. took T.J. to the doctor. Respondent father told Ms. Smith that he had been trying to call her, but there must be something wrong with her phone because he had been unable to leave a message. Ms. Smith testified that she knew nothing about any problem leaving messages on her phone.
*635 Ms. Smith received a telephone call from Toni N. on June 7, 2004 in the afternoon. Toni N. asked if Tyrell J. had called the caseworker. In answer to the caseworker’s inquiry as to what had happened to T.J., Toni N. said that she had been doing Tyrell J.’s hair, and asked him to get the blow-dryer. T.J. jumped up to get it, but she had a cup of water in her hand. Toni N., fearing that T.J. would be electrocuted, grabbed T.J. by her arm. Later that evening, Toni N. noticed that T.J.’s arm was swollen, and put a warm compress on it. She left the warm compress on overnight, but, in the morning, when she took it off, T.J.’s skin came off with it. She took her to the doctor and at the doctor’s office, more skin came off. Ms. Smith testified that during the last case, two years previously, respondent mother had also claimed to have placed a “warm compress” on T.J.’s neck, and that, at that time, T.J. suffered second degree burns and skin from her neck came off. Ms. Smith testified that Toni N. told her that T.J. was at respondent mother’s grandmother’s home. Toni N. also told Ms. Smith that “she didn’t understand why everything happens with T.J.” and that “she was tired of people always looking at her” when allegations involving T.J. arise.
The ACS caseworker, Renee Clement, testified that T.J. and her sister A.J. had been trial discharged to respondents in April 2004. On June 7, 2004, she interviewed T.J. at her maternal great grandmother’s home. T.J., then age four, told the caseworker that “Mommy did it, Mommy put a rag on it.” T.J. also reported that respondent mother twisted her arm while her sister A.J. poured water in her eyes, and that A.J. had also punched her. Ms. Clement testified that she observed T.J.’s physical condition. In addition to the burn on her arm, she had scratches on her neck, and a round bruise under her eye. Ms. Clement took T.J. to New York Hospital for an evaluation on June 10, 2004. In response to the caseworker’s questions while in the car on the way to the hospital, T.J. again told the caseworker that “Mommy did it. Mommy put a rag on it.” However, Ms. Clement did not press T.J. for further details because the child got very quiet and did not want to talk about it.
Dr. Philip Hyden, a pediatrician at New York Hospital and the head of the child protection unit at that hospital, was qualified on consent as an expert in pediatrics and pediatric burns, and, over objection, as an expert in the field of child abuse. Dr. Hyden testified that he examined T.J. on June 10, 2004 when she was just one week shy of her fourth birthday. T.J. had *636 multiple healed injuries over her face, chest, back of neck, essentially all over her body. The doctor observed a healing second degree burn on her right elbow — the burn had penetrated through the epidermis and the dermis and therefore was a partial thickness burn. The burn measured approximately one inch wide by one inch long. The doctor testified that for such a burn to have happened, T.J. would have been exposed to material heated to 120 degrees for at least 20 minutes; if the material was hotter than 120 degrees, the time frame would be less. For example, had the material been heated to 150 degrees, the burn could have been sustained in as little as one second. The doctor testified that a child’s skin is thinner than an adult, and will burn more quickly. However, the doctor also testified that a four-year-old child exposed to a piece of material 120 degrees in temperature would instantly remove her arm, and if the arm were exposed for any period of time, that child would scream or cry in pain. Moreover, the doctor also testified that an adult would not voluntarily hold a piece of material 120 degrees in temperature; if an adult were exposed to material "heated to that temperature, the adult would drop it rapidly or suffer burns as a result of that exposure.
The doctor was asked whether the explanations given by Toni N. to Ms. Eunice or to the caseworker were consistent with the injuries he observed, to a reasonable degree of medical certainty. The doctor testified, with confidence and without hesitation, that they were not. The doctor completely rejected the explanation (as did Ms. Eunice) that the child could have touched an electrical outlet with her hand, having come out of the shower wet, and thus sustained a burn on her elbow. Dr. Hyden was extensively questioned as to whether respondent mother could have placed a rag, which she wrung out and characterized as “warm,” on the child’s arm, and accidentally cause a burn such as he observed on T.J.’s elbow. Dr. Hyden rejected that explanation as well, explaining that Toni N. would not have been able to stand wringing out a rag of the temperature necessary to cause the burn, with her own hands, and that Toni N. would have suffered some injury herself. Toni N. denied incurring any injury. Dr. Hyden was asked whether the burn was consistent with a burn from a hair dryer; the doctor stated that it was not because, to have caused a partial thickness burn from a hair dryer, he would expect to see the imprint of the dryer, and he did not. The doctor also eliminated any organic cause for the child’s injuries. Finally, Dr. Hyden explained that the partial *637 thickness burn penetrated the epidermis and the dermis layers of the skin, required debridement (or removal of that skin), and will result in scarring which is likely to be permanent in nature.
Respondent Mother’s Case
Toni N. testified in her own defense and stated that she and respondent father were home with the children on June 3, 2004 and she was doing Tyrell J.’s hair. T.J., J.N. and A.J. were playing in the dining room. J.W. was watching TV in the living room. Toni N. and Tyrell J. were in the living room, she sitting on the couch and he sitting on the floor between her legs. Toni N. testified that she told Tyrell J. to get the hair dryer, which was not far from him, on the floor. T.J. ran to get the hair dryer, but was carrying a cup of water. Toni N. said she feared T.J. would get hurt, and grabbed her by the arm to prevent her from reaching the hair dryer, which was plugged into an electrical socket.[5] Later that evening, about 9:00 p.m., when the children were in bed, Toni N. went to the bedroom to check on them. At that point, she noticed, in the dark, that T.J.’s arm appeared swollen. She took T.J. from her bed to the bathroom, and dipped a washcloth into “warm” water in the wash basin and applied it to T.J.’s elbow to take down the swelling. Toni N. testified that she did not use ice on the affected area because in the past she had used ice on T.J. and it caused her to turn black and blue. Toni N. testified that she applied the washcloth twice to T.J.’s arm and held it there with her hand for 15 minutes to a half hour. Toni N. stated that T.J. did not cry out or have any adverse reaction. However, after the second application, Toni N. noticed that T.J.’s skin was coming off, and she called her grandmother. Respondent mother said she did not recognize that the injury was a burn. She made arrangements for her grandmother to accompany her to the doctor the following morning. She testified that she wrapped the arm with a clean sock and T.J. went to sleep without incident. Toni N. met her grandmother and took T.J. to the Alpha K clinic the next morning. When Ms. Eunice asked Toni N. at the clinic what had happened to cause T.J. to have a bruise on her eye, Toni N. told her that T.J. had come out of the shower and slipped and fell and hit her eye.
On cross-examination by the agency, Toni N. admitted that she had used a “warm” compress on T.J.’s neck once before, *638 which resulted in T.J. sustaining a burn injury and her removal from her mother’s care by ACS. Toni N. denied that she delayed taking T.J. to the doctor for two days, and denied telling Ms. Eunice that T.J. suffered the burn to her elbow when she touched an outlet with her hand when she exited the shower wet. Toni N. claimed that she had given Ms. Eunice the same explanation for T.J.’s burn injury as she testified to here in court. The mother admitted that she heard Dr. Hyden’s testimony as to a laceration on T.J.’s upper lip, a scar on T.J.’s foot, healed scars on T.J.’s right shoulder and multiple scars over T.J.’s chest, arms, legs and the back of her neck. When asked whether she had explanations for those injuries, respondent mother denied that they existed, said that she had never noticed them and stated that she had no explanation for any of those injuries.
Respondent Father’s Case
Respondent Tyrell J. last appeared in the case on September 7, 2006 at a permanency hearing. Both respondents had been late on a number of occasions during the fact-finding and the court had advised them that it could proceed to inquest in their absence if they failed to appear on time. When the case continued on December 19, 2006, respondent father’s counsel advised the court that she had been in contact with her client who had a job and was unwilling to take further time from work. At that point, the court found that respondent father had willfully absented himself from court, and proceeded to complete the trial with respect to Tyrell J. at inquest. His attorney remained mute. Respondent father has not appeared again, and the court takes a negative inference against him for his failure to appear at this proceeding, provide a reasonable or accidental explanation for T.J.’s injuries and otherwise contest the allegations made against him.
The Law Guardians’ Cases
Since the filing of the petition, respondent has had two after-born children, A.N. (date of birth Oct. 27, 2004) and T.S. (date of birth Sept. 11, 2006). The agency filed derivative charges with respect to both children. T.J.’s Law Guardian represents A.J., A.N. and T.S. J.W. and J.N. each had their own, independent, Law Guardian. All of the Law Guardians supported findings of abuse.
Court’s Decision
The original petition charging respondents in the instant case contained the statutory language in capital letters and bold face on the front of the petition:
*639 “A fact finding that a child is severely or repeatedly abused as defined in subdivision eight of section three eighty four-b of the social services law, by clear and convincing evidence, could constitute a basis to terminate parental rights in a proceeding pursuant to section three hundred eighty four-b of the social services law.”
Proper notice to respondents pursuant to Family Court Act § 1033-b (1) (e) was provided on June 14, 2004.
The agency, in summation, reiterated its position that it had met its burden of proof by clear and convincing evidence that T.J. was a repeatedly abused child and, by virtue thereof, that the other children were derivatively repeatedly abused. Thus, the court will address the adjudication of this petition in four stages: first, whether the agency met its burden of showing that respondents abused T.J., the target child; second, whether by virtue of those actions, they abused the other children; third, whether T.J. was repeatedly abused; and fourth, whether the other children have been repeatedly abused, as that term is defined in Social Services Law § 384-b (8) (b).
Abuse Finding in the Current Case under the Family Court Act
The court found the testimony of the presentment agency’s witnesses entirely credible. The court takes a negative inference against respondent father for his failure to appear and contest the allegations against him. By virtue of his absence, Tyrell J. offered no explanation in court for the injuries suffered by T.J. The court heard the testimony of Toni N. and credited it insofar as she admitted that the child was in her care and that of the father when she suffered the injuries that are the subject of this petition. To the extent that Toni N. offered testimony explaining that T.J. suffered this injury accidentally, the court rejects it as self-serving and entirely lacking in credibility.
The evidence elicited by the presentment agency established that T.J. appeared at the Alpha K clinic on June 4, 2004 suffering from a second degree burn to her elbow. She had a bruise near her eye and scratches on her neck. Respondent mother’s explanation for the burn, that T.J. had exited the bathtub and touched an electrical outlet with her hand, causing the burn, was rejected as incredible and inconsistent with the injuries by the physician’s assistant who treated T.J. Based upon that finding, that physician’s assistant made a report of suspected child abuse to the State Central Register.
Dr. Hyden, a pediatrician who is also the head of the child protection unit at New York Hospital, examined T.J. on June 10, *640 2004. He observed the partial thickness (or second degree) burn to her elbow, the bruise near her eye, a scar on her foot and scratches and healed scars on her neck, chest, arms and legs. Respondent mother provided no explanation for the scar on T.J.’s foot or the scratches and healed scars on her neck, chest, arms and legs. Toni N.’s explanation that she had grabbed T.J. on the arm as she reached for the blow-dryer, causing swelling observed some hours later, which Toni N. treated by applying hot compresses which she administered with her own hands, without suffering any injury, was rejected by the doctor as inconsistent with the partial thickness burn injury that he observed.
Based upon the above evidence, the agency established by clear and convincing evidence that T.J. suffered injuries while in the care of her mother and father, to wit: the partial thickness burn to her elbow, bruise to her eye, scar to her foot and scratches and scars about her body. It is noteworthy that neither respondent contested that T.J. was in their care when she suffered the injuries that brought this case to court. Moreover, as Dr. Hyden explained, the partial thickness burn to her elbow penetrated the epidermis and the dermis layers of the skin, required debridement (or removal of that skin), and will result in scarring which is likely to be permanent in nature. In addition, the fact that these injuries occurred merely weeks after T.J. had been returned to her parents after suffering multiple serious injuries as an infant multiplies the seriousness of the injuries here enumerated. “Risk” of injury is evaluated by looking at past behavior. T.J. was removed from her parents prior to her first birthday based upon multiple fractures, burns and bruises suffered by the time she was 10 months old. At age four, in the care of respondents just a few weeks, she has suffered a partial thickness burn to her elbow, a bruise to her eye and scratches and scars over a good portion of her body. Clearly, she was targeted for abuse, and is at risk for further, future abuse. And this is without mentioning the serious impact these injuries must have upon her emotional health. By virtue of this evidence, the agency established by clear and convincing evidence that T.J. suffered injuries that “create[d] a substantial risk of . . . serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of any bodily organ.” (Family Ct Act § 1012 [e] [i].)
Family Court Act § 1046 (a) (ii) provides that “proof of injuries sustained by a child ... of such a nature as would *641 ordinarily not be sustained or exist except by reason of the acts or omissions of the parent . . . shall be prima facie evidence of child abuse . . . Once ACS met its burden of establishing that T.J. sustained her injuries while in the exclusive care of her parents, the burden shifted to respondents to show a reasonable and adequate explanation for how these injuries occurred. (Matter of Philip M., 82 NY2d 238, 244 [1993]; Matter of Shawniece E., 110 AD2d 900 [2d Dept 1985]; Matter of Marc A., 301 AD2d 595 [2d Dept 2003].)
Respondents provided no reasonable explanation for those injuries. Tyrell J., respondent father, stopped coming to court in the midst of the fact-finding, and waived his right to provide the court with such an explanation. The court takes a negative inference against him for his failure to appear in court and offer a reasonable or accidental explanation for the injuries. (See Matter of Whitney H., 19 AD3d 491 [2d Dept 2005]; Matter of Commissioner of Social Servs. v Philip De G., 59 NY2d 137 [1983].)
Toni N. provided various explanations of how T.J. sustained these injuries while in her care and the care of T.J.’s father, Tyrell J., none of which were consistent with the injuries sustained, and all of which were rejected by the expert medical witness called by the presentment agency. It is noteworthy that Toni N. did not proffer any expert medical testimony supporting her explanation.
It is quite clear and not requiring expert testimony on point that if a person who is wet and coming from the bath or shower touches an electrical outlet with his/her hand, they will not sustain a burn to the elbow. Thus, Toni N.’s first explanation, offered to Ms. Eunice at the Alpha K clinic, is rejected as patently absurd. Indeed, Toni N. appears to have been persuaded of that explanation’s absurdity since she abandoned it thereafter. The court, however, fully credits Ms. Eunice’s statements that such was the explanation given to her by Toni N. on June 4, 2004 and does not credit respondent’s statements that she gave Ms. Eunice the same explanation as she gave in her testimony here in court.
Respondent mother’s second explanation also does not provide a reasonable or accidental explanation for the injuries sustained by T.J. First, when Toni N. began her explanation, it appeared that she was seeking to blame the burn on T.J., by somehow linking it to her attempt to pick up the blow-dryer while carrying a cup of water. Clearly, picking up a blow-dryer while carry *642 ing a cup of water does not explain a partial thickness burn to the child’s elbow. Toni N. then went on to explain that she grabbed the child by the arm, not causing any discomfort to the child. Hours later, after the child had gone to bed, respondent mother aroused the child and brought her to the bathroom where she applied a warm or hot washcloth to the child’s arm in a stated attempt to address swelling noticed on the child’s arm. Respondent claimed she held the cloth in place with her hand and suffered no injury or redness; respondent claimed that T.J. made no complaint as she applied the washcloth to her arm for 15 minutes to a half hour. Yet, as soon as this home remedy was completed, respondent noticed that T.J.’s skin was coming loose from her arm, she called her grandmother for advice, agreed to take the child to the doctor the following morning, and left the child with other family members thereafter until the child was taken back into care by the agency.
Respondent mother admitted that, in the earlier case involving T.J., she had applied a warm or hot compress to the child’s neck, causing a burn to her neck. In that case, the skin from the neck also became loose. However, respondent stated that, in spite of that experience, and in spite of completing parenting skills at the agency, she still believed that applying heat to a swollen area was an appropriate home remedy, at least in part because T.J., according to respondent mother, turned black and blue when ice was applied to a swollen area.
It is clear that respondent mother’s explanation is unworthy of belief as a reasonable or accidental explanation for the injury. Dr. Hyden testified that the cloth would have to have been at least 120 degrees to have caused the burn sustained by T.J. Such heat would not have been withstood by Toni N. had she been applying it with her hands as she claimed. Moreover, T.J. would have been screaming and crying in pain. Toni N.’s explanation is not internally consistent or credible, and was rejected as inconsistent with the injury and scientifically incredible by the expert witness. The court similarly rejects the explanation partially in reliance on the expert testimony, and partially because, based upon all the evidence before the court, and the common sense being applied by the court in its position as factfinder, the explanation is simply not credible. It must be said that the lack of credibility of respondent mother’s proffered explanations, and the absence of respondent father to provide any explanation at all, leads the court to infer that, in some way that has not yet been explained, respondents intentionally *643 inflicted the injuries upon T.J., who was clearly the target child. The summation of J.W’s Law Guardian certainly supported this view. There was therefore no credible reasonable or accidental explanation for T.J.’s injuries presented to the court.
Based upon the lack of any reasonable or accidental explanation by the parents, the court finds by clear and convincing evidence that the parents abused the subject child T.J. as defined in Family Court Act § 1012 (e) (i) and enters findings of abuse against both parents with respect to T.J. (Family Ct Act § 1046 [a] [ii].)
Findings of Derivative Abuse as to the Siblings
Proof of the abuse of one child, i.e., T.J., is admissible upon the issue of abuse or neglect of the siblings. (Family Ct Act § 1046 [a] [i].) The court finds based upon the above-enumerated evidence that respondents, by virtue of the physical and emotional injuries inflicted upon T.J., created an environment in which there was a substantial risk of physical injury by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health, or protracted loss or impairment of the function of any bodily organ as to the other children in respondents’ care, i.e., J.W., J.N., A.J., A.N., and T.S. (Family Ct Act § 1012 [e] [ii].) In her testimony, respondent mother stated that J.W, J.N. and A.J. were all home when T.J. sustained the injuries that brought her to court. While none of those children were called as witnesses, all of the Law Guardians supported findings of abuse against respondents. The lack of parenting judgment that caused respondents to target T.J. so that she suffered the multiple injuries that brought this case before the court created a substantial risk that the other children who were in the home, as well as the after-born infants who are also before the court, A.N. and T.S., could be similarly targeted or suffer the emotional trauma of watching a sibling targeted for serious physical injury. Evidence of fundamental flaws in a respondent’s understanding of the duties of parenthood such as the continuing nature of the abuse or the fact that it was accomplished by physical violence when other children were in the room can “affirmatively create[ ] a substantial risk of physical injury which would likely cause protracted impairment of [a nontarget child’s] physical and/or emotional health within the meaning of Family Court Act § 1012 (e) (ii), thus rendering it reasonable to conclude that [the child] was derivatively abused.” (Matter of Amanda LL., 195 AD2d 708, *644 710 [3d Dept 1993].) Under these circumstances, the court finds that the agency has established that respondents derivatively abused J.W., J.N., A.J., A.N., and T.S. and enters findings against respondents with respect to all five of those children under Family Court Act § 1012 (e) (ii). (Matter of Crystal Roxy Lynn D., 296 AD2d 408 [2d Dept 2002]; Matter of Eli G., 189 AD2d 764 [2d Dept 1993]; Matter of Christina Maria C., 89 AD2d 855 [2d Dept 1982]; see also Matter of Jeremy H., 193 AD2d 799 [2d Dept 1993].)
Findings as to Repeated Abuse under the Social Services Law
At this point, the court will turn its attention to the presentment agency’s position that it proved by clear and convincing evidence that the subject child T.J. was repeatedly abused.[6]
“[A] child is ‘repeatedly abused’ by his or her parent if:
“(i) the child has been found to be an abused child, (A) as defined in paragraph (i) of subdivision (e) of section ten hundred twelve of the family court act, as a result of such parent’s acts; . . . and “(ii) (A) the child or another child for whose care such parent is or has been legally responsible has been previously found, within the five years immediately preceding the initiation of the proceeding in which such abuse is found, to be an abused child, as defined in paragraph (i) or (iii) of subdivision (e) of section ten hundred twelve of the family court act, as a result of such parent’s acts . . . ; and “(iii) the agency has made diligent efforts, to encourage and strengthen the parental relationship, including efforts to rehabilitate the respondent, when such efforts will not be detrimental to the best interests of the child, and such efforts have been unsuccessful and are unlikely to be successful in the foreseeable future.” (Social Services Law § 384-b [8] [b].)
The court, as outlined above, has found by clear and convincing evidence that respondents abused T.J. and has entered a *645 finding of abuse pursuant to Family Court Act § 1012 (e) (i) as to the instant petition. Thus, the first prong of Social Services Law § 384-b (8) (b) is satisfied.
The court took judicial notice of prior proceedings in this court with respect to respondents under docket Nos. NA027313/01 and N10192/01. On April 30, 2002, Honorable Robert F. Clark entered a finding of abuse under Family Court Act § 1012 (e) (i) as to T.J. with respect to both respondents after fact-finding. Dispositional orders with respect to T.J. were entered on March 11, 2003. Entry of the dispositional orders on March 11, 2003 concluded the 2001 abuse proceeding; the instant petition was filed on June 9, 2004. This evidence establishes by clear and convincing evidence that T.J. was adjudicated an abused child under Family Court Act § 1012 (e) (i) within five years of the filing of the instant petition. Thus, the second prong of Social Services Law § 384-b (8) (b) is satisfied.
Judicial notice of prior proceedings in this court with respect to respondents under docket Nos. NA02731-3/01 and N10192/01 further established that, as to T.J., the orders required that she be placed with the Commissioner for 12 months effective March 10, 2003, that respondent parents cooperate with ACS supervision and that they comply with required services, including regular visitation and counseling. Ms. Clement and Ms. Smith both testified that respondents cooperated with services put in place to rehabilitate respondents and facilitate reunification of the family. Based upon the parents’ cooperation in services and presumed rehabilitation from the issues that resulted in the court’s abuse finding against them in 2003, T.J. was returned to her parents in April 2004.
The findings made by the court and outlined in detail (supra) establish that no later than June 3, 2004, and probably for some period before that, respondents abused T.J. by either inflicting upon her, or allowing to be inflicted upon her while in their presence, serious physical injuries including a partial thickness burn to her elbow, a bruise to her eye, a laceration to her lip, a bite mark to her foot, and numerous scars and scratch marks over her body. Thus, within mere weeks of her return to the family after an extended absence during which services allegedly rehabilitated the parents to ensure that they would not abuse T.J. or any of the other children in the future, T.J. was again abused. This establishes by clear and convincing evidence that while the agency engaged in diligent efforts to rehabilitate respondents and strengthen the parent/child bond, those efforts *646 have been unsuccessful and are unlikely to be successful in the foreseeable future. Thus, the third prong of Social Services Law § 384-b (8) (b) is satisfied.
Based upon clear and convincing proof by the agency that satisfies all criteria outlined in Social Services Law § 384-b (8) (b), the court enters a finding by clear and convincing evidence that respondents repeatedly abused T.J.
Repeated Abuse Findings as to the Other Children
As noted above, the court on the instant docket entered derivative findings of abuse against respondents with respect to the other children, based upon respondents’ abuse of T.J. These findings are entered under Family Court Act § 1012 (e) (ii). Similarly, when Honorable Robert F. Clark entered derivative findings of abuse with respect to J.N., J.W and A.J. in 2002/2003 on the 2001 dockets (supra), he also entered those findings pursuant to Family Court Act § 1012 (e) (ii). Social Services Law § 384-b (8) (b) is quite specific with respect to the definition of repeated abuse: the child must be found to have been abused as defined in Family Court Act § 1012 (e) (i) or (iii). Family Court Act § 1012 (e) (ii) is specifically, and notably, omitted. This court finds that the Social Services Law will not permit derivative findings of repeated abuse under the terms of that statute and the court therefore makes no findings as to repeated abuse as to J.W., J.N., A.J., A.N. or T.S., under the court’s plain reading of the statute.

. As outlined infra, there was a discrepancy between the testimony of the ACS caseworker, who stated that T.J. was returned to her parents in April 2004, and the agency caseworker who stated that the return took place in May 2004.

. On July 11, 2001, the agency filed a new petition under docket No. N10192/01, which made the same allegations as to the incidents involving T.J., but alleged that as a result the newborn baby girl, later named A.J., was derivatively abused.

. On July 10, 2006, respondent mother’s attorney requested to be relieved inasmuch as Toni N. had retained private counsel. The court granted the motion, but directed counsel to be prepared to proceed on the adjourn date. That directive was followed and the substitution of counsel did not delay the fact-finding.

. June 3, 2004 by reference to a calendar.

. On direct examination, and on cross by the agency, respondent testified that the blow-dryer was plugged into an electrical socket by the television. On cross-examination by T.J.’s Law Guardian, respondent changed her story and stated that the blow-dryer was not plugged in, but that the plan was to plug it in behind the couch.

. The agency and Law Guardians argued for findings of “severe and repeated abuse.” The court rejects any argument that, by virtue of the allegations in the instant petition, T.J. was severely abused as that term is defined in Social Services Law § 384-b (8) (a). While respondents’ actions may loosely be characterized as “depraved,” they did not, in this court’s opinion, rise to the level of “reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life.” (Social Services Law § 384-b [8] [a] [i].)